IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

UNITED STATES OF AMERICA

V.                                              CRIMINAL NO. 3:08cr77-DPJ-LRA

MARK J. CALHOUN, et al.

MEMORANDUM OPINION AND ORDER

Defendants Mark Calhoun (hereinafter "Calhoun"), April Calhoun, Larry Kennedy, Keith Kennedy, and Willie Jones were charged in a 38-count indictment for various acts of wire fraud, money laundering, and conspiracy related to the procurement of mortgage loans from various lenders.  April Calhoun and Jones pled guilty and testified at trial.  The jury found the Kennedy Defendants guilty on all counts related to them and Mark Calhoun guilty on all but two of the counts.

The case is now before the Court on the following post-trial motions:  (1) Defendant Keith M. Kennedy's Motion for Judgment of Acquittal, or in the Alternative, for a New Trial [231]; Defendant Mark J. Calhoun's Motion Renewing Motion for a Judgment of Acquittal of Count 38 [232]; and Defendant J. Larry Kennedy's Motion for Judgment of Acquittal, or in the Alternative, for a New Trial  [235].  The Court, having fully considered the premises, desires oral argument on the money-laundering counts, takes the multiplicity argument under advisement, and otherwise denies the motions.

I.      Standards

Under Rule 29, the Court may set aside a jury's verdict of guilt if "the evidence is insufficient to sustain a conviction" of one or more of the offenses charged in the indictment. Fed. R. Crim. P. 29(a), (c).  The standard for reviewing a claim of insufficient evidence is

"'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the evidence establishes the essential elements of the crime beyond a reasonable doubt.'" *United States v. Bellew*, 369 F.3d 450, 452 (5th Cir. 2004) (quoting *Jackson v. Virginia*, 43 U.S. 307, 319 (1979)).

Rule 33 allows the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The grant of a new trial is necessarily an extreme measure, because it is not the role of the judge to sit as a thirteenth member of the jury." *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997). Therefore, "motions for new trial are not favored, and are granted only with great caution." *Id.* (citing *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977)). "A new trial is granted 'only upon demonstration of adverse effects on substantial rights of a defendant.'" *United States v. Rasco*, 123 F.3d 222, 228 (5th Cir. 1997) (quoting *United States v. Cooks*, 52 F.3d 101, 103 (5th Cir. 1995)). An error affects the defendant's substantial rights if "it affected the outcome of the trial court proceedings." *United States v. Alarcon*, 261 F.3d 416, 423 (5th Cir. 2001); *see also United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005) (holding that "[t]he restitution order affected [the defendant's] substantial rights because the outcome of the district court proceedings would have been different if the error had not occurred").

Unlike a motion for judgment of acquittal, the Court may weigh the evidence and assess the credibility of witnesses with respect to a motion for new trial. *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997) (citing *Tibbs v. Florida*, 457 U.S. 31, 37–38 (1982)). "The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* at 1118. "[A]ny error of sufficient magnitude to require

2

reversal on appeal is an adequate ground for granting a new trial." *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004) (quoting 3 Charles Alan Wright, et al., *Federal Practice and Procedure* § 556 (3d ed. 2004)).  Based on the applicable standards, the Court finds that neither acquittal nor a new trial is warranted in this case.

II.     Analysis

        A.      Kennedy Defendants

        Defendants Larry Kennedy and Keith Kennedy—father and son—raise many of the same grounds in support of their separately filed Motions.  The Court will first address those that have been raised by both and separately consider the remaining issues.

                1.      Sufficiency of the Evidence

         Larry and Keith Kennedy both challenge the sufficiency of the evidence supporting these charges and the denial of their Rule 29 motions at trial.  Larry Kennedy's post-trial Motion merely states, without explanation, that the evidence fails to support any of the 38 counts against him.  Keith Kennedy's Motion was similarly vague, but the Court requested and received additional briefing regarding Keith Kennedy's Motion.

        During the course of this five-week trial, the jury heard testimony from more than forty witnesses and the Government introduced scores of exhibits related to over forty real-estate transactions.  The volume and repetitive nature of the evidence dictate a more general summary, as does the non-specific nature of the pending Motions.  The following analysis is intended to supplement, not replace, the bench ruling on the Rule 29 motion at trial.[1]

---

[1]The Court notes that the Government's Response to Keith Kennedy's post-trial Motion raises a number of factual issues that are not addressed herein but that add weight to this Order.

a.      Conspiracy to Defraud and Fraud

The fraudulent schemes alleged in Counts 1, 2, and 16 of the Indictment were multi-faceted.[2]  The transactions typically began when Calhoun found homes for which the sellers would accept less than the list price.  Calhoun would agree to pay the seller the lower amount, but would then arrange for unwitting purchasers to buy the property at the full list price.  At closing, the difference was funneled to Calhoun or his surrogates Willie Jones and April Calhoun, Calhoun's daughter.  To accomplish that goal, the HUD-1 Settlement Statements reflected payments to third-party lien holders for items such as construction and management services.  In reality, these third-party lien holders were shell companies formed by Calhoun, Willie Jones, and April Calhoun.  According to Jones and April Calhoun, the shell companies provided no services, and documents supporting the liens were fakes.  In the end, the sellers would receive the amount they agreed to accept, but the lenders loaned more than the actual purchase price, and the buyers/borrowers incurred additional debt to pay Calhoun's companies for services never rendered.  The scheme also hid from the lenders the true payoff to Calhoun and his cohorts.  Various lender witnesses testified that they would have rejected the loans had they known Calhoun and others were receiving tens of thousands of dollars through these third-party liens.  The Kennedys closed the subject loans through their company Loan Closings and Title Services, Inc ("LCTS").

The Government established the Kennedy's knowledge regarding this aspect of the scheme in several ways.  For example, Willie Jones testified that the co-defendants used the

---

[2]Without deciding factual issues, the Court will recount facts that were sufficiently supported to survive motions for judgment of acquittal or new trial.

4

third-party payments to "pull money out" of the loan closings.  Significantly, he claimed to have discussed the subject with Larry Kennedy.  Jones also testified that Larry Kennedy participated in a double closing on a single property on the same day, revealing that money "pulled out" of the loan for an entity named Metro One was actually paid to Jones.  Similarly, one of Calhoun's employers, Jason Ellis, testified that he discovered third-party payments to Calhoun's company, Fast Start Mortgage, and immediately confronted Larry Kennedy.  As for Keith Kennedy, he prepared all of the closing documents containing these misrepresentations, and the Government presented evidence that he failed at times to obtain validation that the third-party lien holders were actually owed money.  Plus, documents contained in collective exhibit G-13 regarding a February 16, 2005 closing provide circumstantial evidence that Keith Kennedy knew that $66,500 paid to Fast Start Mortgage was actually paid to Calhoun.

Another aspect of the scheme involved misrepresenting the buyers/borrowers' finances in order to obtain loans and receive more favorable terms.  First, many of the buyers/borrowers Calhoun recruited were not eligible for the types of loans they received.  In some of those cases, incomes were overstated and supported by falsified documents.  Second, the closings were structured to hide liabilities from lenders.  Calhoun undisputedly arranged for the same buyers/borrowers to purchase multiple properties in rapid succession.  This, according to the Government's witnesses, prevented the liabilities from appearing on the buyers/borrowers' credit reports.  Third, lenders were falsely informed that the properties they financed would be used as primary residences—for which lenders gave better terms than investment properties.  These representations repeatedly appeared in HUD-1 Settlement Statements and Certificates of Occupancy.  The rapid succession of closings also masked the investment nature of the

transactions—the prior purchases did not show up on credit reports, so the lenders did not know the same buyer/borrower was purchasing multiple properties as primary residences.

Finally, Keith Kennedy prepared all of the documents supporting these rapid-succession closings, each time drafting a HUD-1 Settlement Statement and a Certificate of Occupancy indicating that the property would be used as a primary residence. LCTS employee Teri Lynn Rankin testified that Calhoun's repetitive closings were unusual. Kennedy argued that the pattern was not apparent to him at the time. But a reasonable jury could conclude that closing several sales of different primary residences to the same buyer/borrower over a short period of time provides circumstantial evidence of Keith Kennedy's knowledge.

The jury also heard credible evidence that the Kennedys (1) notarized numerous forged signatures; and (2) falsely attested that signatures were signed in their presence. Tom Rile, of the Mississippi Secretary of State's Office, explained that under notary regulations, the Kennedys' presence was required when the documents were signed. Yet, the Kennedys allowed Calhoun to conduct so called "travel closings" where Keith Kennedy prepared closing documents and gave them to Calhoun to use in closings outside the LCTS office. When Calhoun returned with fully executed documents, Keith or Larry Kennedy would falsely notarize them as having been signed in their presence by the buyers/borrowers. Former LCTS employee Teri Lynn Rankin testified that she asked Larry Kennedy about the "travel closings" and was told that Kennedy called the buyers/borrowers to confirm their signatures. Given the number of buyers/borrowers who testified that their signatures were forged, the jury could reasonably

concluded that Larry Kennedy's statement was false and reflected a consciousness of guilt.[3]  A reasonable jury could likewise conclude that the Kennedys knew their representations were false because they would have known whether they were present at closing and whether the correct person signed the documents.  The lender witnesses explained why the Kennedys' representations as notaries were material to the lending process.

The Government presented additional circumstantial evidence of the Kennedys' knowledge and intent.  For example, when April Calhoun told her dad she needed money, he told her to get it from Larry Kennedy.  Kennedy then wrote April a $1,500 check drawn from the Kennedys' company LCTS and made no request for repayment.  This transaction undermines the Kennedys' contention that Mark Calhoun was just one of many loan originators who passed through LCTS, and suggests a joint enterprise between the Kennedys and Calhouns.  Also, Rankin testified that she told Larry and Keith Kennedy she was concerned about the size of Calhoun's loans and that the Kennedys acknowledged concern.  Finally, some of the buyers/borrowers brought no money to the closings, if they appeared at all.  Yet the closing documents Keith Kennedy prepared, and he and Larry finalized, indicated that the buyers paid cash at the closing.  According to the lenders, those misrepresentations materially affected the terms of the loans.  That the Kennedys knowingly closed loans reflecting cash from the buyers when none was received provides further circumstantial proof of their knowledge that the loans were not legitimate.

---

[3] As discussed in Part A.6, *infra*, the "travel closings" provide evidence supporting the deliberate ignorance instruction.  Based on that instruction, the jury could find that the Kennedys deliberately blinded themselves to the full extent of the fraudulent scheme.

In sum, there is no real dispute that the Kennedys made false representations associated with the loan closings.  Those representations materially affected the terms of the loans Calhoun secured.  The Kennedys also facilitated each fraudulent transaction.  As for their knowledge and intent regarding the broader goals of the conspiracy, a reasonable jury could conclude that the Kennedys knew their co-defendants' were engaging in fraud given the repetitive nature of the obvious malfeasants.  Mark Calhoun's fraudulent conduct was brazen, and yet the Kennedys continued to facilitate the fraudulent transactions.  And even if the Kennedys did not know the full extent of the fraudulent scheme, a reasonable jury could find deliberate ignorance.  Coupled with the aiding-and-abetting instruction, the evidence was sufficient to support the various fraud counts of the conviction.

> b.      Money Laundering

Counts 18 through 21 and 23 through 34 of the Indictment charged the Kennedys with promotional money laundering under 18 U.S.C. § 1956(a)(1)(A)(I).  Counts 17 and 22 of the Indictment charged the Kennedys with conspiracy to commit money laundering under 18 U.S.C. § 1956(h).  The conspiracy counts charged the parties with conspiring to commit promotional money laundering under 18 U.S.C. § 1956(a)(1)(A)(I) and conspiracy to commit concealment under § 1956(a)(1)(B)(I).[4]

---

[4]Section 1956 states in relevant part as follows:

(a)(1)  Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

> (A)(I) with the intent to promote the carrying on of specified unlawful activity; or

Defendants claim that the wire-fraud counts and the money-laundering counts merged, resulting in separate convictions for the same conduct.  When Defendants were originally indicted, Fifth Circuit precedent would support a finding of guilt on both the promotional and concealing forms of money laundering under these facts.  But in June 2008, the United States Supreme Court decided *United States v. Santos*, 553 U.S. 507 (2008).  In *Santos*, a plurality of the Court concluded that, under the facts of that case, the term "proceeds" in a promotional money-laundering scheme means "profits" rather than "receipts."  *Id.* at 515–16.[5]  As the Fifth Circuit noted in *United States v. Cooks*:

> The [*Santos*] plurality reasoned that, without a "profits" definition of "proceeds," the defendant could be guilty of the additional offense of money laundering even though the transaction was a normal part of the underlying offense (*e.g.*, illegal gambling).  To hold otherwise would effectively merge the two offenses, resulting

---

. . . .

      (B)  knowing that the transaction is designed in whole or in part--

            (I) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity

. . . .

shall be sentenced . . . .

. . . .

(h) Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

18 U.S.C. § 1956 (2006).

[5]Congress subsequently amended the money laundering statute to expressly define proceeds to include gross receipts.  18 U.S.C. § 1956(c)(9) (2009).  But this case must be decided under the pre-amendment version of the statute.

> in a second conviction for the same crime.  Defining "proceeds" as "profits,"
> however, eliminates this problem.

589 F.3d 173, 181 (5th Cir. 2009) (citing *Santos*, 128 S. Ct at 2026–27).

The Court granted Defendants' request for an instruction defining "proceeds" as "profits," but the Court still questions whether the disputed disbursements were "profits" or just "a normal part of the underlying offense."  *Id*.; *see also Santos*, 553 U.S. at 528 (Stevens, J., concurring).  After trial, the Fifth Circuit clarified the issue in *Garland v. Roy*, 615 F.3d 391, 402 (5th Cir. 2010).  The Court desires briefing of the issue in light of *Garland*.  Accordingly, the parties are granted until May 20, 2011, to submit supplemental briefs on this issue.  The briefs shall be no more than 8 pages in length, and no replies will be filed.  The Court will then address the issue at sentencing.

2.      Whether the Court Erred in Allowing Evidence of Relevant Conduct

The Kennedys renew their trial objections to evidence of transactions not specifically addressed in the Indictment.  Defendants generally argued that this evidence was extrinsic to the charged offenses and inadmissible under Rule 404(b).  The rule prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith."  Fed. R. Evid. 404(b).  The evidence failed to implicate Rule 404(b) for several reasons.

To begin, Rule 404(b) does not prohibit the introduction of intrinsic evidence.  *United States v. Yi*, 460 F.3d 623, 632 (5th Cir. 2006).  Evidence is intrinsic "when the evidence of the other act and evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005) (quoting *United States v. Williams*,

900 F.2d 823, 825 (5th Cir. 1990)) (internal quotation marks omitted).  Intrinsic evidence is generally admissible to "complete the story of the crime."  *United States v. Walters*, 351 F.3d 159, 166 n.2 (5th Cir. 2003).

Although it is an unpublished opinion, *United States v. Kirkham* provides a thoughtful summary of the issue:

> If the existence of a scheme to defraud is an element of the offense, then acts and transactions constituting a part of that continuing offense are admissible as proof of the criminal enterprise.  Evidence of an uncharged offense arising out of a scheme or artifice to defraud is not "extrinsic" within the meaning of 404(b) and thus not excludable on this ground.  The prosecution may offer evidence of any surrounding circumstances that are relevant to prove intent or motive with respect to the fraudulent scheme.

129 F. App'x 61, 73 (5th Cir. 2005) (citations omitted); *see also United States v. Brown*, 553 F.3d 768, 789 (5th Cir. 2008); *Freeman*, 434 F.3d at 374; *United States v. Dula*,  989 F.2d 772, 777–78 (5th Cir.  2008); *United States v. Santagata*, 924 F.2d 391, 393–394 (1st Cir. 1991).  The Eleventh Circuit reached the same result in a mortgage fraud case in *United States v. Muscatell*, 42 F.3d 627, 631 (11th Cir. 1995) (*citing Dula*).

To be thorough, the Court notes that in *United States v. Nguyen*, a mortgage-fraud case, the Fifth Circuit held that evidence of other fraudulent transactions was not intrinsic.  504 F.3d 561, 574 (5th Cir. 2007).  But prior decisions like those cited above indicate that the issue requires examination of the facts.  Unlike *Nguyen*, in which the court found that "each deal was a distinct and distinguishable event," *id.*, at 574, the disputed exhibits here relate to ongoing transactions involving Defendants and the same buyers/borrowers over a short period of time.  As previously noted, the Government contended that the timing of the transactions hid liabilities from creditors.  Many of the challenged exhibits related to closings that were the first in a series

11

of loans obtained for the same buyer/borrower.  Accordingly, these initial transactions were

necessary to demonstrate the timing of the closings.  In this way, they were inextricably

intertwined with and necessary preliminaries to the crime charged.  *Freeman*, 434 F.3d at 374;

*see also United States v. Powers*, 168 F.3d 741, 749 (5th Cir. 1999).  Rule 404(b) does not apply.

The evidence was also admissible as part of the charged conspiracy.  Each conspiracy

count in the Indictment first provides a description of the alleged scheme and then states that the

listed overt acts "among others" were committed.  *See* ¶¶ 27 (Count 1); 51 (Count 17); 60 (Count

22).  In *Powers*, the Fifth Circuit held that "where a conspiracy is charged, acts that are not

alleged in the indictment may be admissible as part of the Government's proof."  168 F.3d at 749

(citing *United States v. Quesada*, 512 F.2d 1043, 1046 (5th Cir. 1975) (explaining that the

Government, in proving a conspiracy, is not limited to overt acts alleged in the indictment and

that the prosecution "may show other acts of the conspirators occurring during the life of the

conspiracy"); *United States v. Bullock*, 451 F.2d 884, 889 (5th Cir. 1971)).  Thus, because the

non-pled transactions in *Powers* tended to show the conspiratorial relationship between the

defendants during the life of the conspiracy, the court found that the "other acts" were intrinsic

to the Government's proof and not subject to Rule 404(b).  The same is true in the present case.

Finally, the Court considered whether the other evidence created unfair prejudice,

confusion, or undue delay under Rule 403.  It did not.  First, the evidence was highly probative

of the Defendants' intent, reflecting a plan and the absence of mistake.  It likewise reflected the

existence of the multiple schemes.  And the probative nature of the evidence was not

substantially outweighed by Rule 403 concerns.  Second, there was no surprise at trial, as the

Government identified and produced documents related to the disputed transactions.  *See*

*Kirkham*, 129 F. App'x at 73 (finding no error in introduction of other transactions and noting that defendants "receive[d] fair notice of this evidence, as the government either produced or allowed defendants access to all of it well in advance of trial").

Having reviewed the matter post-trial, the Court finds no error. But even if the Court abused its discretion in this regard, such errors are reviewed under the harmless-error doctrine. *United States v. Ragsdale*, 426 F.3d 765, 774–75 (5th Cir. 2005). Here, if error occurred, it was harmless and did not affect Defendants' substantial rights. The misrepresentations found in the challenged exhibits mirrored the irregularities found in the scores of exhibits related to transactions listed in the Indictment. Admission of the other-acts evidence does not require new trial.

> 3. Whether the Court Erred in Denying Defendants' Motions to Sever and/or Motion for Mistrial

Before trial, Larry Kennedy joined Calhoun's pre-trial Motion to Sever [168]. He also sought severance at various times during trial, and both of the Kennedys sought a mistrial after Calhoun was twice accused of inappropriate contact with jurors. Their renewed arguments are denied.

Joint trials "play a vital role in the criminal justice system." *Richardson v. Marsh*, 481 U.S. 200, 209 (1987). As noted in *Zafiro v. United States*, "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." 506 U.S. 534, 540 (1993). "A severance is reversible only on a showing of specific compelling prejudice. 'There is a preference in the federal system for joint trials of defendants who are indicted together,' particularly in conspiracy cases.'" *United States v. Lewis*, 476 F.3d 369, 383 (5th Cir. 2007) (quoting *Zafiro*, 506 U.S. at 537) (1993)) (other citations omitted). "[A]

district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

As an initial matter, the Court denied the pretrial Motions to Sever in an Order [173] entered January 15, 2010.  Several of the issues raised in those initial motions never materialized at trial, such as the impact of co-defendant testimony.  The only issue that was re-urged during trial related to antagonistic defenses.  There is no need to repeat the analysis provided in the pre-trial Order [173], as nothing at trial suggested that the defenses were antagonistic under the standard addressed in *Zafiro*.  *See United States v. Daniels*, 281 F.3d 168, 177–78 (5th Cir. 2002) (affirming join trial and noting that defenses must be so diametrically opposed that "the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant").[6]  Defendants have not met their burden, and there was no showing of prejudice.  Even if prejudice did exist, public interest in judicial economy during this five-week trial was strong, and the Court provided proper limiting instructions.  *Cf. id.* at 178.[7]

---

[6]Calhoun's defense that there was nothing wrong with the sales the Kennedys closed was in no way inconsistent with the Kennedys' defense that they did nothing wrong.

[7]The instruction read as follows:

A separate crime is charged against one or more of the defendants in each count of the indictment.  Each count, and the evidence pertaining to it, should be considered separately.  The case of each defendant should be considered separately and individually.  The fact that you may find one or more of the accused guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or any other defendant.  You must give separate consideration to the evidence as to each defendant.

The only new issue that arose during trial was Calhoun's contact with two jurors.  The first incident occurred when Calhoun encountered a juror at a grocery store after court was adjourned and stated in her presence, "God is with me."  The Court interviewed the juror and concluded that she should be dismissed.  The juror stated that she had not discussed the matter with any other juror, and each juror confirmed her statement.  All parties agreed to the procedures followed by the Court, and finding no evidence of taint, the motions to sever were denied.  The second incident occurred when a juror thought Calhoun may have greeted her in some way at the courthouse entrance.  Again, the Court elected to interview the jury with the parties' consent.  The second juror stated that she was in no way affected, and she was not removed.  All other jurors readily stated that the incident would have no impact on their decisions.  More specifically, the jurors dismissed any notion that they would hold Calhoun's actions against the Kennedy Defendants.

The juror issues did not merit mistrial or severance.  *See, e.g., United States v. Aviles*, 274 F.2d 179, 193 (2nd Cir.) (affirming denial of mistrial where co-defendant "burst into a tirade before the jury" and holding that if "such conduct by a co-defendant on trial were held to require a retrial it might never be possible to conclude a trial involving more than one defendant; it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so"), *cert. denied*, 362 U.S. 974, 982 (1960).  *See also United States v. West*, 877 F.2d 281, 288 (4th Cir.) (affirming and holding "that the district court's cautionary instructions adequately protected Williamson and Thomas from their co-defendants' misconduct"), *cert. denied*, 493 U.S. 959 (1989).  And as stated above, the Court instructed the jury to consider the Defendants separately.

15

4.      Whether the Court Erred in Denying Motion for a Bill of Particulars

The Kennedys seek new trial because Magistrate Judges Sumner and Anderson twice

denied their requests for a bill of particulars [158, 197].[8]  According to the Fifth Circuit Court of

Appeals:

> The purpose of a bill of particulars is to provide sufficient notice of a charge for
> its defense and to minimize surprise at trial. . . .  Denial of a motion for a bill of
> particulars is reviewable on appeal from a judgment of conviction, but the
> judgment will be reversed only if denial of the bill was a clear abuse of discretion.
> Such an abuse will be found only if it appears that the accused was actually
> surprised at trial and that his rights were substantially prejudiced by the denial.

*United States v. Vasquez*, 867 F.2d 872, 873–74 (5th Cir. 1989) (citations omitted).

In the present case, Magistrate Judge James Sumner first addressed the issue in an Order

that carefully reviewed the Indictment and the information Defendants requested.  Order [158]

Oct. 19, 2009 at 2.  Judge Sumner concluded:

> The indictment apprises Defendants of the charges against them in sufficient
> detail in order to enable them to prepare their defenses and to preclude subsequent
> prosecution for the same offenses; that is all that is required.  Defendants are not
> entitled to particularized details of the manner in which the crimes were
> committed.

*Id*. at 4 (citations omitted).  Magistrate Judge Linda Anderson denied a subsequent Motion for

the reasons stated in Judge Sumner's Order.  *See* Order  [197] Feb. 11, 2010.

Judge Sumner was correct.  While numerous documents were produced, the general

schemes alleged in the Indictment repeated throughout the exhibits.  For example, the jury saw

dozens of HUD-1 Settlement Statements from various closings that all contained the same

irregularities in the same fields.  Moreover, the Government produced *Jencks* statements from

---

[8]Defendants never appealed the rulings under 28 U.S.C.A. § 636(b)(1)(A).

16

witnesses identifying the alleged fraud in the closing documents.  Thus, the combination of the Government's production and the allegations of the Indictment were sufficient to inform the Defendants of the fraud that had been alleged.  *United States v. Carreon*, 11 F.3d 1225, 1239–40 & n.68 (5th Cir. 1994) (finding no abuse of discretion in failure to order bill of particulars and noting that "the government provided Carreon with substantial discovery  materials revealing the government's theory of the case, and the prosecutor further explained this theory during pretrial hearings for severance"); *United States v. Vasquez*, 867 F.2d 872, 874 (5th Cir. 1989) ("It is well established that if the government has provided the information called for in some other satisfactory form, then no bill of particulars is required.").

Finally, Defendants have not demonstrated actual surprise at trial or that their rights "were substantially prejudiced by the denial."  *Vasquez* , 867 F.2d at 874.  Defendants had the documents; they were given continuances to review them; the patterns of alleged fraud were readily apparent and consistent with the allegations of the Indictment; and the Court recalls no surprise or substantial prejudice.  Defendants have not met their burden of demonstrating abuse of discretion.  *Id*.

### 5.    Generic Objections

Defendants offer several generic objections, such as Larry Kennedy's statement that "[t]he Court erred in overruling the objections to admission of evidence at critical stages of the trial."  Def.'s Mot. [235] ¶ IX.  These general grounds for new trial are denied for the reasons stated at trial.

17

6.       Deliberate Ignorance Instruction

Keith Kennedy seeks new trial due to the inclusion of a deliberate ignorance instruction. The instruction was read, verbatim, as it appears in Fifth Circuit Pattern Jury Instruction 1.37:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him.  While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

The issue now is whether the Court's instructions, taken in their entirety, made "a correct statement of the law and whether [the instructions] clearly instruct[ed] jurors as to the principles of law *applicable to the factual issues confronting them*."  *United States v. Lara-Velasquez*, 919 F.2d 946, 950 (5th Cir. 1990) (quotation marks and citation omitted).  The Court's instructions must be legally accurate, as well as factually justified.  *Id*.  In assessing whether the evidence supports a given instruction, courts view "the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Government."  *Id*.

The deliberate ignorance instruction "is only to be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." *United States v. Nguyen,* 493 F.3d 613, 618 (5th Cir. 2007) (citations omitted); *see also United States v. Skilling,* 554 F.3d 529, 549 (5th Cir. 2009); *vacated in part on other grounds*, 130 S. Ct. 2896 (2010).  "Although the deliberate-ignorance instruction may present the risk of conviction on the basis of negligence rather than knowledge, [the Fifth Circuit has] consistently held that the instruction is appropriate when the defendant claims he lacks the requisite guilty knowledge and the proper factual basis exists for the instruction."  *United States v. Fuchs*, 467 F.3d 889, 902 (5th Cir. 2006) (affirming verdict and finding no abuse of discretion in giving deliberate

18

ignorance instruction).  Thus, there are two general questions: (1) is knowledge disputed; and (2) is the instruction factually supported.

Here, knowledge was disputed, so the Court turns to whether the instruction was factually supported.  As often stated by the Fifth Circuit, the instruction may be given when the Court determines that the evidence at trial raises two inferences:  "(1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposefully contrived to avoid learning of the illegal conduct."  *Lara-Velasquez*, 919 F.2d at 951; *see also United States v. Orji-Nwosu*, 549 F.3d 1005, 1009–10 (5th Cir. 2008).

This Court weighed these factors on the record at trial.  In summary, the evidence was sufficient to raise an inference that the Kennedys were subjectively aware of illegal activity.  *See supra* Part III(A)(1)(a).  The second prong—purposeful contrivance—is met at least by evidence regarding "travel closings" and by notarization of forged documents.

Finally, the instructions must be read as a whole.  First, the Court gave a full definition of the word "knowingly."  The deliberate ignorance instruction was on the same page as that instruction and related to that definition.  Second, the Court gave Keith Kennedy's balancing instruction on "good faith" even though it was not required.[9]  *See United States v. Hunt*, 794 F.2d

---

[9]The instruction read:

The good faith of the defendant is a complete defense to the charge because good faith on the part of the defendant is simply inconsistent with intent to defraud.  A person who acts on a belief or opinion honestly held is not punishable under the statute merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong.  An honest mistake in judgment or error in management does not rise to the level of intent to defraud.  The burden of proving good faith does not rest with the defendant because the defendant does not have any obligation to prove anything in this case.

1095, 1098 (5th Cir. 1986) (holding good faith instruction not necessary).  That instruction

further highlighted the difference between imputed knowledge and intent.  *See Skilling*, 554 F.3d

at 550 (discussing the difference between knowledge and intent in context of deliberate

ignorance).  Accordingly, this argument is not persuasive.[10]

  B.  Mark Calhoun

  Calhoun generally reurges all of his trial arguments and specifically attacks his

conviction as to Count 38.  Starting with the general, the Court adopts its trial rulings (although

some are addressed above).  And any error, for which harmless error standard applies, would not

justify new trial given the overwhelming proof of guilt.  *See Cotton v. Cockrell*, 343 F.3d 746,

752 (5th Cir. 2003) (finding error harmless in light of the "overwhelming evidence of guilt").

  Count 38 charges Calhoun with money laundering under 18 U.S.C. § 1957(a) as to loan

proceeds from the purchase of his personal residence.  Section 1957(a) precludes monetary

transactions greater than $10,000 involving "criminally derived property."  As a threshold point,

the evidence sufficiently established that Calhoun obtained the loan proceeds by fraudulent

means.  The HUD-1 Settlement Statement reflected pay-off of a $143,949.96 lien to Fast Start

Mortgage.  Evidence further demonstrated that Fast Start Mortgage was a Calhoun created shell.

---

  [10]Defendant's only authority for excluding the pattern instruction at trial was *United States v. Chen*, which addresses the issue in light of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 856(a)(1).  913 F.2d 183, 190 (5th Cir. 1990).  But *Chen* has failed to take root in the Fifth Circuit beyond § 856(a)(1) and has been rejected in cases such as *United States v. Scott*, where the court found no error in giving the instruction in a wire fraud context.  159 F.3d 916, 924 (5th Cir. 1998).  Instead, "[t]he Fifth Circuit has approved the deliberate ignorance  instruction in cases involving the offenses in this case: conspiracy; bank fraud; and money laundering," *Nguyen*,  493 F.3d at 618  n.1 (citing *Scott*, 159 F.3d at 924 (5th Cir. 1998) (bank fraud); *United States v. Soto-Silva*, 129 F.3d 340, 345 (5th Cir. 1997) (conspiracy); *and United States v. Fuller*, 974 F.2d 1474, 1482 (5th Cir. 1992) (money laundering)).

Thus, the HUD-1 Settlement Statement stated that third-party liens were satisfied at closing and that Calhoun received only those funds necessary to purchase the home.  Unbeknownst to the lender, Calhoun received $143,949.92 in cash.  That amount was then wired to an account Calhoun controlled, and Calhoun immediately transferred $70,000 to his wife's account.  The $70,000 transfer forms the basis of the § 1957(a) charge.

> Calhoun offers no specific challenge to these facts.  Instead, he contends that he
>
> was the actual borrower on the transaction and did not serve as a broker or receive any broker's fees, all monies he received as a result of the transaction were loan proceeds, for which he was personally responsible for repaying to the lender. Therefore, the proceeds were not "profits" - nor did they contain any modicum of profit.

Def.'s Mot. [232] at 2 (citing *Santos*, 128 S. Ct. at 2020).

The term "criminally derived property" in § 1957 means "any property constituting, or derived from, *proceeds* obtained from a criminal offense."  18 U.S.C. § 1957(f)(2) (emphasis added).  At the time of the offense, "proceeds" was not defined.  But the Court in *Santos* held, in the context of an illegal gambling operation, that the term "proceeds" means "profits" rather than "receipts" under a § 1956.  553 U.S. at 514.  According to Calhoun, the same definition applies under § 1957 and Count 38 must be dismissed because Calhoun realized no profit from the funds he was required to repay.

"The precedential value of *Santos* is unclear outside of the narrow factual setting of that case, and the decision raises as many issues as it resolves for the lower courts."  *United States v. Brown*, 553 F.3d 768, 783 (5th Cir. 2008).  Because *Santos* was a plurality opinion, the stare decises effect is driven by the narrowest holding that garnered five votes.  *Marks v. United States*, 430 U.S. 188, 193 (1977).  Thus, courts look to Justice Stevens's concurrence in which he

first noted that "the same word can have different meanings in the same statute.  [Therefore,] this

Court need not pick a single definition of 'proceeds' applicable to every unlawful activity, no

matter how incongruous some applications may be."  *Santos*, 553 U.S. at 525 (Stevens, J.,

concurring) (citing *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004)).  Justice

Stevens then observed a "merger problem" when "proceeds" were defined as "receipts" under

the facts of *Santos*.  *Id*. at 527.  He opined:

> Allowing the Government to treat the mere payment of the expense of operating
> an illegal gambling business as a separate offense is in practical effect tantamount
> to double jeopardy, which is particularly unfair in this case because the penalties
> for money laundering are substantially more severe than those for the underlying
> offense of operating a gambling business.

*Id*.  To resolve the "merger problem" in light of the rule of lenity, Stevens defined "proceeds" as

"profits" under the factual circumstances presented.  *Id*.

Some circuits have concluded that *Santos* applies to Sections 1956 and 1957 with equal

force.  *See*, *e.g.*, *United States v. Bush*, 626 F.3d 527, 536 (9th Cir. 2010).  But the question is

whether *Santos* would apply to § 1957 in the context of these specific charges.  To answer that

question, the Court turns to the Fifth Circuit's recent interpretation of *Santos* in *Garland v. Roy*.

In *Garland*, the court rejected all four interpretations of *Santos* previously offered by

other circuits and adopted a two step inquiry.  First, "proceeds" must mean "profits" when

defining "'proceeds' as 'gross receipts' . . . [would] result in the 'perverse result' of the 'merger

problem.'"  615 F.3d at 402–03 (citing *Santos*, 553 U.S. at 528 (Stevens, J., concurring)).

Second, absent a merger problem or contrary legislative history, the Court presumes that

"proceeds" means "gross receipts."  *Id*. at 402.

Turning to Count 38, the Indictment charged in relevant part:

> [Calhoun] did knowingly engage and attempt to engage in a monetary transaction
> through a financial institution, affecting interstate commerce, in criminally
> derived property of a value greater than $10,000, that is, a wire transfer from
> AmSouth Bank totaling approximately $70,000.00, such property having been
> derived from a specified unlawful activity, that is a violation of Section 1343,
> Title 18, United States Code, all in violation of Sections 1957 and 2, Title 18,
> United States Code.

Thus, the charged money laundering relates to a distinct down-stream monetary transaction

occurring after the "specified unlawful activity" (wire fraud) was fully accomplished.  *See*, *e.g*.,

*United States v. Atiyensalem*, 367 F. App'x 845, 846 (9th Cir. 2010) (finding *Santos* inapplicable

because defendant "was not charged with any other crime that would have resulted in his being

convicted for two different crimes for the same behavior.").  As a result, there was no "merger

problem," and absent contrary legislative history—which has not been identified— "proceeds"

means "gross receipts."  *Garland*, 615 F.3d at 402.  The Government was not required to prove

profit as to Count 38, and the Court's pre-*Garland* instruction to the contrary was error as to

Count 38.

The Sixth Circuit reached a similar conclusion in *United States v. Kratt*, 579 F.3d 558

(6th Cir. 2009).  There, the defendant fraudulently obtained a loan and argued that *Santos*

applied to § 1957(a) requiring the Government to prove a profit.  The Sixth Circuit first

concluded that "proceeds" under § 1957 could be interpreted to mean "profit" under *Santos*.  But

the court interpreted Justice Stevens' *Santos* concurrence as holding that "'[p]roceeds' does not

always mean profits, . . . it means profits only when the § 1956 predicate offense creates a

merger problem that leads to a radical increase in the statutory maximum sentence."  579 F.3d at

562.  Finding that § 1957 carried a lighter maximum sentences than the underlying criminal

activity, the court found no "merger problem" and held *Santos* inapplicable.  *Kratt* applied a

slightly different test—the Fifth Circuit does not consider the sentencing disparity—but offers persuasive support for finding no "merger problem" in the context of Count 38.

Although this Court granted the requested instruction defining "proceeds" as "profits," the instruction was error inuring to Calhoun's benefit. The subject conduct clearly satisfied the elements of the offense.[11]

III.    Conclusion

The parties' briefs on the money-laundering issue, in light of *Garland*, are due no later than May 20, 2011, and are limited to a maximum eight pages. Oral argument on this issue will take place at sentencing. The multiplicity argument will be addressed at sentencing. All other relief requested by Defendants is denied for the reasons given herein.

**SO ORDERED AND ADJUDGED** this the 10th day of May, 2011.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE

---

[11]Defining "proceeds" as "profits" in this context is problematic. Under *Santos*, the Government must show a mere modicum of profit. *Brown*, 553 F.3d at 784–85. But *Santos* had no reason to further define the term "profit" given the nature of the gambling operations. The same is not true with respect to a fraudulently obtained loan for which an obligation to repay exists. Justice Clay's concurrence in *Kratt* opined that "on any interpretation of *Santos*, the proceeds of Kratt's loan were profits that undoubtedly exceeded the $10,000 statutory minimum set forth in 18 U.S.C. § 1957(a)." *Kratt*, 579 F.3d at 566 (Clay, J., concurring). The *Kratt* majority recognized various potential definitions but stopped short of deciding the issue because there was no "merger problem" and *Santos* did not apply anyway. 579 F.3d at 564–65. If nothing else, *Kratt* highlights that Justice Stevens did not have fraudulently obtained loans in mind when he narrowly opined that defining "proceeds" of a gambling enterprise as "profits" would resolve the "merger problem." Here, the jury was instructed that "proceeds" means "profits," and it was left to apply the plain meaning of "profits" to the facts of this case. A reasonable jury could find that the $143,949.96 Calhoun fraudulently obtained included a modicum of profit because Calhoun had unfettered access to the funds and never repaid the loan.