UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V.  CRIMINAL NO. 3:08CR77 DPJ-LRA
CIVIL NO. 3:14CV122 DPJ (LARRY KENNEDY)
CIVIL NO. 3:14CV191 DPJ (KEITH KENNEDY)

J. LARRY KENNEDY AND KEITH M. KENNEDY

ORDER

This criminal matter is before the Court on Defendants Larry and Keith Kennedy's motions to vacate [441, 443] pursuant to 18 U.S.C. § 2255. Having fully considered the petitions, the Court finds that the United States should respond to one of the Kennedys' grounds for relief but that their petitions should be otherwise denied without hearing.

I.  Background

Defendants Mark Calhoun, April Calhoun, Larry Kennedy, Keith Kennedy, and Willie Jones were charged in a 38-count indictment for various acts of wire fraud, money laundering, and conspiracy related to the procurement of mortgage loans from various lenders. April Calhoun and Jones pleaded guilty and testified at trial. The jury found the Kennedy Defendants guilty on all counts related to them and Mark Calhoun guilty on all but two of the counts.

Larry and Keith Kennedy now assert—in essentially identical memoranda—that their attorneys were ineffective and that the judgment should be vacated. More specifically, both Defendants raise the same three general arguments: (1) their attorneys failed to offer exculpatory evidence; (2) their attorneys failed to investigate and/or effectively call and examine witnesses; and (3) their attorneys prevented them from testifying.

II.     Standard

Pursuant to 28 U.S.C. § 2255(a), a prisoner in custody may move under limited circumstances to "vacate, set aside or correct the sentence."  When, as here, a convicted defendant collaterally attacks his conviction or sentence based on the effectiveness of his counsel, he has the burden of proving by a preponderance of the evidence that his constitutional rights have been violated.  *Johnson v. Zerbst*, 304 U.S. 458, 469 (1938).  To do that, a defendant must satisfy the two-part test addressed in *Strickland v. Washington*:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. 668, 687 (1984).  A petitioner must satisfy both prongs of the *Strickland* test to succeed.  *Id*. at 687.

To prove the deficiency prong of the test, the Kennedys "must show that counsel's representation fell below an objective standard of reasonableness."  *Id*. at 688.  In considering an attorney's performance under this element, the court considers the "reasonableness [of the attorney's performance] under prevailing professional norms."  *Id*.  The *Strickland* court cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential."  *Id*. at 689.  Thus, there exists a "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance."  *Id*.  As stated in *Strickland*:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the

2

> evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* As to trial strategy, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690–91.

The prejudice prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. To meet this standard, the Kennedys "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Where, as here, "a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id*. at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect . . . . Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id*. at 695–96. With those standards in mind, the Court turns to the specific arguments.

III.     Analysis

        A.       Ground One—Deficiencies Regarding Exculpatory Evidence

The Kennedys argue that their attorneys William Kirksey (who represented Larry Kennedy) and Michael Knapp (who represented Keith Kennedy) were both in possession of an audio-taped interview between co-defendant Mark Calhoun and the United States Attorney's Office and that both attorneys lost their copies. The Kennedys describe the tape as containing threats and intimidation by the United States Attorney's Office to get Mark Calhoun to incriminate them. Larry Kennedy Mem. [442] at 2; Keith Kennedy Mem. [444] at 2. They now claim that their attorneys were ineffective for losing and failing to offer what they describe as exculpatory evidence. *Id.*

Mark Calhoun did not testify, so any alleged threats never produced any incriminating testimony or evidence. The question then is whether Kirksey and Knapp were deficient for allegedly losing and failing to offer "exculpatory" evidence. At this point, it is not clear whether the attorneys were deficient in failing to offer the tape—the evidentiary basis for which is not clear. It is likewise unknown what the tape contains, whether it was indeed exculpatory, and whether its absence was prejudicial. While the Court has doubts, it would be more prudent to hear the tape and allow the attorneys and the United States to address the argument. Therefore, Kirksey and Knapp are given 45 days to file affidavit responses addressing this issue. The United States is instructed to file a response within 30 days of the filing of both affidavits.

        B.       Ground Two—Deficiencies Regarding Investigation, Evidence, and Witnesses

The Kennedys claim that Kirksey and Knapp were both ineffective for failing to investigate and neglecting to call and/or cross-examine certain witnesses. More precisely, they

4

both contend that their attorneys failed to (1) interview and call witnesses the Kennedys suggested, including loan closing attorneys and builders; (2) call or cross-examine Mark Calhoun; (3) adequately cross-examine witnesses; (4) call or interview witnesses identified by the Government; and (5) object to false statements in opening and closing.  In addition to these mutual arguments, Keith Kennedy also claims that Knapp was ineffective for failing to make an opening or closing statement and for objecting to severance.

1. Failure to Call Witnesses Identified by the Kennedys

The Kennedys claim their attorneys failed to call witnesses the Kennedys had identified. The Fifth Circuit "has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citing *Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008)).  For this reason, "the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Id*.  This rule applies to both lay and expert witnesses. *Id*.

The Kennedys have not met this burden.  Their memoranda generally describe categories of witnesses, who were "willing to testify," or with whom Defendants "made arrangements" to testify. *See, e.g.*, Larry Kennedy Mem. [442] at 6.  But the Kennedys never name these witnesses. *See Day*, 566 F.3d at 538.  And while they claim the witnesses were willing to testify, they fall short of making any showing that the witnesses were "available to testify at trial and would have done so." *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (noting that

petitioner failed to sufficiently establish that witness were available to testify on trial date (citing *Day*, 566 F.3d at 538)). Some of these witnesses are described as co-conspirators of Mark Calhoun. There is nothing in the record beyond speculation that the witnesses would have actually testified.

Finally, the descriptions of the proposed testimony are not sufficiently specific and fail to show prejudice. *See Day*, 566 F.3d at 538. Even assuming the unnamed witnesses would have testified as the Kennedys claim, it would not account for the Government's theory of the case—that the Kennedys falsely certified certain procedural steps in the loans they were closing and either knew or were deliberately ignorant to co-defendant Mark Calhoun's scheme. *See United States v. Kennedy*, 707 F.3d 558, 568 (5th Cir. 2013) (affirming judgment, explaining evidence, and noting that "there was ample evidence supporting a deliberate ignorance instruction"). There is no dispute in the record evidence that the Kennedys made false statements when they notarized loan closing signatures as having been executed in their presence when they were not. *Id*. The proffered testimony from the unnamed witnesses would not address that issue.

### 2. Failure to Call or Cross-Examine Mark Calhoun

This argument fails on the record. First, there is no deficiency in failing to cross-examine Mark Calhoun because he never testified. Second, the alleged failure to call Mark Calhoun is not sufficient because there is no suggestion he would have testified—indeed he refused to do so. *See Day*, 566 F.3d at 538.

### 3. Inadequate Cross-Examination

The Kennedys generally argue that their attorneys failed to adequately cross-examine Government witnesses. Having presided over the trial, the Court cannot say that the

6

examinations were deficient under *Strickland*. In many instances, they were quite forceful. Regardless, the Kennedys offer only one concrete example regarding the testimony of Willie Jones. Jones testified that he spoke with Larry Kennedy about "'pulling money out of' loans." Larry Kennedy Mem. [442] at 6. Jones explained that he and Mark Calhoun created false liens in favor of companies Jones controlled for work that was never performed. When the obligations were settled at closing, the liens resulted in funds being funneled to Jones and Calhoun. The Kennedys concede that this testimony is "technically not a lie," but contend that it was "cleverly couched . . . to indicate that Petitioner knew of and cooperated with the conspirators to defraud the lenders when in fact Mr. Jones was referring to the times he routinely presented invoices to the Petitioner for repairs, etc., made on properties," which, according to the Kennedys, was not fraudulent. *Id*.

 A review of the record indicates that Jones did testify that he discussed pulling money out of the loans with Larry Kennedy and never directly stated that Kennedy knew it was improper. But the record further reflects that Kirksey extensively cross-examined Jones regarding the scheme. In particular, Kirksey went through a number of examples of money being "pulled out" during closing. Kirksey established that the liens were disclosed on the HUD documents; Jones did not know what Calhoun told Kennedy about the liens; Jones did not know whether Calhoun gave Kennedy documentation to support the transactions; Jones did not attend many of the closings; many of the liens were for work purportedly done by Jones's legitimate construction company; Kennedy knew there was a legitimate company because Jones had offered to do work on the Kennedys' office and otherwise held himself out to Kennedy as having a legitimate construction company; and Larry Kennedy never received a dime from the "pull outs."

7

Kirksey may not have asked the precise question Larry Kennedy wanted him to ask, but doing so may have been the classic "one question too many."  Jones was a Government witness, and Kirksey did not give him the opportunity to potentially provide what was missing from his initial testimony—direct evidence of Larry Kennedy's knowledge of the scheme.  Kirksey's examination reflected sound strategy, was thorough and well investigated, and was constitutionally effective.

          4.          Inadequate Investigation of Government Witnesses

In this argument, the Kennedys contend that both of their attorneys failed to interview any of the "witnesses identified by the government" and were deficient in their cross-examinations or in the decision not to call these Government witnesses.  *See* Larry Kennedy Mem. [442] at 7.  As an initial point, the Kennedys' petitions are not entirely clear with respect to the timing of this argument.  If they are referring to witnesses listed in the Government's witness list, then the discovery order precluded contact:  "Any witness appearing on the witness list of either the government or of the defendant provided under this Order shall not be interviewed by the other parties at any time subsequent to the exchange . . . ."  *See* July 21, 2009 Order [82].  Complying with this Order would not be constitutionally deficient representation.

But assuming the Kennedys are referring to actions before the witness lists were exchanged, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  The scope of the investigation required varies from case to case, but "at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case."  *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985).  "A

defendant who alleges a failure to investigate on the part of his counsel must allege *with specificity* what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989) (emphasis added); *see also Charles v. Stephens*, 736 F.3d 380, 390 (5th Cir. 2013) (quoting same language).

The Kennedys have not met these standards. They never identify these Government witnesses (other than Willie Jones), never explain how the cross-examinations were deficient or prejudicial, never establish that these unnamed witnesses would have been available and willing to testify if called by Defendants, *see Day*, 566 F.3d at 538, and generally fail to show how the alleged lack of investigation would have altered the outcome. *Green*, 882 F.2d at 1003.

Finally, the purported testimony lacks specificity and does not demonstrate prejudice. As with the witnesses they claim to have identified for their attorneys, the Kennedys believe that certain witnesses identified by the Government would have established that the Kennedys were simply loan-closing agents who "made sure the documents were properly signed" among other duties. But as mentioned earlier, the jury heard overwhelming evidence that the documents were not properly signed—they were forged—and that the Kennedys allowed it to happen by notarizing false signatures that were executed outside their presence. It also heard overwhelming evidence that the Kennedys' failure to fulfil their duties as loan closing agents facilitated the scheme to defraud and that they were at least acting with deliberate ignorance. *See Kennedy*, 707 F.3d at 561–62 (affirming judgment and examining evidence against the Kennedys). In sum, the description of the proffered evidence is not specific enough and does not establish prejudice.

        5.        Failure to Object During Opening Statements and Closing Arguments

According the Kennedys, the prosecutor stated during opening and closing that they "reaped thousands of dollars from fraudulent loans" when in reality they were just paid for closing the loans. *See, e.g.*, Larry Kennedy Mem. [442] at 9. To begin, it is not apparent that the prosecutor made the precise statement the Kennedys allege. But even if she did, the statement was essentially true because the Kennedys were paid for all of the fraudulent loans they closed. Their argument boils down to semantics, was addressed by defense counsel in opening and closing, was addressed in the record evidence, and fails to demonstrate prejudice.

        6.        Keith Kennedy's Separate Arguments

Keith Kennedy claims that Knapp was deficient for failing to make an opening or closing statement and for objecting to a co-defendant's motion to sever. Neither is sufficient. First, Knapp did make a closing argument. Second, the federal rules allow a defendant to forgo an opening statement, and it is often sound strategy to do so. Declining an opening is not deficient, and Kennedy has not shown that it was prejudicial. Finally, Knapp's objection to severance was not below the objective standard of care. Keith Kennedy was not the main focus of the prosecution as he would have been in a severed case. Regardless, there is no prejudice because the Court would not have severed the case anyway.

        C.        Ground Three—Deficiencies Regarding the Right to Testify

For their final ground for relief, both Kennedys contend that their attorneys were deficient for preventing them from testifying on their own behalf. These arguments are factually and legally meritless.

From a factual standpoint, both Defendants premise their arguments on facts the record will not support. Starting with Larry Kennedy, he claims to have

> planned to testify but when the Government rested, Kirksey said to the Movant, "They have presented no evidence that can get you convicted and you might say something that the jury could use against you. You'd be a damned fool to get on that stand." Movant, thinking he would have time to consider the matter while other defense witnesses testified and believing Mr. Kirksey and not himself was the expert, acquiesced. Mr. Kirksey then announced, "The defense rests" without calling a single witness.

Larry Kennedy Mem. [442] at 9. But the Government rested its case on March 17, 2011. When it did, Kirksey informed the Court that Larry Kennedy had not yet decided whether to testify. The trial was then adjourned for the evening. The next morning, counsel announced that all three Defendants had elected to remain silent, and Defendants confirmed the decision on the record. After another day and a half of legal argument on other issues, Defendants finally rested, and Larry Kennedy expressed no desire to change his mind and testify.

Keith Kennedy's argument is similarly lacking in factual support. He claims that

> Mr. Knapp prvented [sic] Petitioner from testifying in his own behalf, advising him that, "The Government has failed to prove their case. You don't have to prove anything." Petitioner, believing Mr. Knapp to be an expert, reluctantly agreed to not testify."
> . . .
>  Petitioner insisted on testifying. However, despite his protests, Knapp refused to allow the Defendant to testify in his own behalf. Knapp's refusal to alow [sic] the Defendant to testify in his own behalf violated Defendant's Constitutional Rights . . . .

Keith Kennedy Mem. [444] at 10. But when counsel informed the Court that all Defendants would invoke their Fifth Amendment Rights, the Court asked: "[Y]ou have decided not to testify. Is that correct?" Larry Kenney responded, "That's correct, sir," and Keith Kennedy

11

responded "Yes." And like Larry Kennedy, Keith Kennedy remained silent the next day when his attorney rested, lodging no protests on the record.

Any claim that their attorneys made the decision for them or somehow prevented them from testifying also contradicts their representations in open court. When the decision was announced to invoke the Fifth Amendment right to remain silent, the Court advised both Defendants that they had the right to testify or remain silent and the jury would be instructed not to hold their silence against them. Consistent with *Rock v. Arkansas*, 483 U.S. 44, 49–52 (1987), the Court further informed the Kennedys as follows:

> All right. And this is important. Whether you remain silent is a decision that belongs only to you. Okay. I'm sure you've discussed it with your attorney, but this is not a decision that your attorney can make. You have to be the one to make the decision. Do each of you understand that?

Both Larry and Keith Kennedy responded, "Yes, sir." Thus, the Kennedys were properly instructed about their rights, confirmed their understanding and desire to remain silent, and had ample time to consider their decisions. Neither voiced any objection when their attorneys rested without calling them. Based on the record, the Kennedys cannot factually argue that they were rushed into, or denied, the decision to testify.

The arguments are also legally insufficient. Under the first *Strickland* prong, the court must remain "highly deferential to counsel's trial strategy." *United States v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002) (citation omitted). Whether to advise a defendant to testify is a matter of strategy, "which should not easily be condemned with the benefit of hindsight." *Id*. (internal quotation omitted). Indeed there exists "a strong presumption that counsel's decision not to place him on the stand was sound trial strategy." *Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001); *see also Robison v. Johnson*, 151 F.3d 256, 262 (5th Cir. 1998) ("[E]ven with the benefit

of hindsight, we find that counsel's strong recommendation against Robison's testifying represented reasonable trial strategy."); *Hollenbeck v. Estelle*, 672 F.2d 451, 454 (5th Cir. 1982) (finding reasonable trial strategy to advise defendant not to because it "might do more harm than good . . ."). Although there are circumstances where this presumption can be overcome, given the facts presented above, those circumstances do not exist. *See generally Mullins*, 315 F.3d at 453–54. And as to Larry Kennedy, the advice seems particularly sound given his prior felony conviction.

Finally, even assuming the advice was constitutionally deficient, there is no prejudice. Neither Kennedy has sufficiently demonstrated what he would have said that would have satisfied the prejudice prong, and as Kirksey advised Larry Kennedy, taking the stand would subject Defendants to vigorous cross-examination by the Government.

D.     Hearing

With respect to Grounds Two and Three, § 2255(b) provides that an evidentiary hearing should be held "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." Generally, the movant must produce "independent indicia of the likely merit of [his] allegations." *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006) (citations omitted). For the reasons stated above, and after review of the extensive record in this case, the Court finds that the record conclusively shows no basis for relief as to Grounds Two and Three. No hearing will be held as to those grounds. Ground One is taken under advisement pending response.

IV.    Conclusion

IT IS, THEREFORE, ORDERED that the United States should provide copies of the Kennedys' § 2255 motions and memoranda, along with a copy of this Order, to William Kirksey and Michael Knapp.  Kirksey and Knapp shall file affidavit responses to Ground One within 45 days of this Order.  The United States will then have 30 days to file its response, which should include a copy of the disputed tape. [1]

Grounds Two and Three are dismissed; Ground One is taken under advisement.

Defendant Larry Kennedy's motion for status [445] is granted; this Order constitutes an update of the status of his motion.

**SO ORDERED AND ADJUDGED** this the 21st day of July, 2014.

> s/ *Daniel P. Jordan III*
> UNITED STATES DISTRICT JUDGE

---

[1] All filings should be made in the Criminal Action, 3:08CR77.